Good morning. Good morning. Good morning, Your Honors. My name is Greg Ellis, and I'm here on behalf of Appellant Raul Quiroz. I'd like to reserve five minutes for rebuttal, please. Thank you. Well, thank you for telling me who you are. Every day, no one wanted to tell me who they were, and I had to keep asking, please tell me who you are. All right, go ahead and proceed. Sure. We covered a lot of ground in the briefing, and I think it was pretty thorough. What I'd like to do this morning, in addition to answer questions the Court might have, is step back and take one category of ineffective assistance and look at that with a wider lens to explain how we view determining the error, whether there's error or not, the first prong of Strickland. The category I'm going to take is the audio recording, the clandestine jailhouse audio recording. And there are a lot of issues that sprung off of that, but basically the audio recording itself is the nucleus, and the conduct or the omissions of trial counsel relating to that is what gave rise to kind of a cascading series of errors. When we talk about cumulative prejudice, which we also, I'm not planning to talk about today, but I can, that is a situation where something might not be prejudicial, but when various elements of error are brought together, as the Court knows, the combined effect is prejudicial. But the term cumulative error, and this is what I want to, I tried to clarify this a bit in the reply brief, and I want to emphasize it again here, does not mean that if you have one omission, one morsel of conduct that's not error, and you have another one that's not error, you can bring them together and say combined they constitute error. We understand that. But what we are arguing is something like this Court talked about in Browning, that it's more of an ongoing and continuous below standard representation regarding a category, a particular category. So when deciding, for example, whether his review of the audio tape was too cursory, he didn't even realize it was only 19 days out. I have a question on the audio. It was not clear where the audio resurfaced, the original audio. Did that ever come up? Was that reviewed in State court? What happened was, yeah, it's not clear what the original audio is. I asked, excuse me, on habeas I asked for it. So did somebody have an opportunity to listen to the original audio at some point? Not from the defense team. And what happened was this issue, of course, came up on habeas. We couldn't bring it in the direct appeal. I sent a letter to the DA and said, you know, this is not the original. My expert tells me this is step down and we need to see the original, please. And they responded, what we gave you is what we have. And that's it. Maybe you can sort of surround that. I have some questions just because Loftus does say he listened to some of the video, correct? Yes. I don't see anything, my understanding of the record as it's before us, that your client never said anything to Loftus about Kano confessing at the time. That that came later because you said you didn't bring up on direct appeal. So when's the first time Mr. Kiedos said that Kano confessed on this video? In the habeas we have a declaration from Mr. Kiedos where he said, I told, he kept telling trial counsel all the inculpatory stuff and all the inculpatory statements, whether by Kano or by Rachel Burr, her inferences. He kept saying, if you listen to the audio, you will see I never said that. And we have his declaration saying that. And I thought we had cited it in terms of him telling Loftus. But what does Loftus say? Does Loftus say that your client told him that? You know, off the top of my head. That's kind of important.  I can, I can, I can, I actually have his declaration here. So if court will indulge me for one second. You know, quickly looking at it, I don't see that he said anything. But in terms of the habeas proceeding, what Mr. Kieros said was sufficient to create a, to make a prima facie showing, but also I don't even think, I don't even think it's necessary because I don't think that our position is that, that I'm, you know, I'm sure that Mr. Kieros told Mr. Loftus I never confessed. But, but I don't think that's a necessary element because Loftus' litigation of the case going forward reflected that he did not believe the client confessed either. Okay, do you allege that the unlistened to portions of the recordings contained exculpatory evidence? Yes. And what is your best evidence of that? So is there any evidence in the record of that, that we now have a recording that says, Kano, I did it? That's, that's, that's a, that's a two-level question because the, the audio that we had, so no one, no one has heard the audio that I think Rachel Burr listened to, which was given to her by her husband, who ran the jailhouse operation. So we can't. Well, the audio that you have, is there anything in that audio that, that's exculpatory? There is, there is conversation in that, between Kano and Kieros, where it's, we've had two experts listen to it because we don't, you know, it's, it's difficult. We had one expert. We had an audio expert and then. Well, this is, you're kind of, just tell me. Okay. What the evidence says is that. What exculpatory evidence do you have that's in the record that's exculpatory? Okay, there's, Burr testified that Kieros said stuff. But on, on video, on the audio. On the audio, right, right. Okay, I understand. I'm sorry. We're talking past each other. We do a lot of context, so I apologize. The, there are back and forth conversations with Kano and Kieros where Kieros, according to our point of view, did not say, I killed this guy. That there's a, there's a dialogue that says, did you hear about that? And Kieros said, yeah, was that you? And then he said something like, yeah, I smoked him or I did this or something. Our people say, our, my associate and then the audio experts say that was Kano who said that. Trying to intimidate, continue to intimidate Kieros. And Burr testifies that she did not hear him say that. She did not hear him say that. I've got a different question. Yeah. And that is, he was convicted on one of two alternative theories. One is that he was the shooter and the other one is that he aided and abetted. Now, if he's convicted on aided and abetted, I don't know how much this tape helps you, even if the tape unambiguously says I didn't do it. Because on an aided and abetted theory, he doesn't have to have done it. I think the reason the tape, he was, okay, the one, we don't, we never really had a aiding and abetting. They were given the instruction, but it never was broken down that way. But the, as I recall it, but the enhancement for using a gun in the commission of the crime was found not true, was found not true by one person. And then all the other 11 jurors found it to be true. Right. So we argued on direct appeal that implicitly that juror was finding he was an aider and abetter, but we then did the whole argument about why he, that the prosecution didn't meet the requirements of aiding and abetting. And we showed that. So when it came to habeas, we just, you know, we took what we had, which we had to. And, but the point is that. Are you still arguing that there was insufficient evidence to support aiding and abetting? No, we did not. We didn't.  So I accept that there was enough evidence of aiding and abetting. So back to my question then. Why does it matter whether he was the shooter or not for our present purposes? Because the, he was convicted of being the shooter. He had to have been because none of the, because otherwise. In other words, 12 people didn't say aiding and abetting. So we had had at least 11 people who said he was the direct shooter. Well, he was convicted of first degree murder on one of two theories. One that he was the shooter and the other one was the aider and abetter. But, but we, we think it's possible to infer from the actual breakdown of the ballots, because the only thing that led to the aiding and abetting would have been the enhancement. And the enhancement shows that 11 people found he used a weapon in the commission of the crime. So he. Well, I don't. Well, I don't. 11 did, but one did not. One did not. So the only thing he was convicted of was first degree and felon in possession. Yes. Yes. So. So in other words, there were two theories on the table and it looks as though one of the jurors, I agree with you, one of the jurors convicted on aiding and abetting. What, what, the way, the reason, our position on this is that Cano, I mean, if you, if, if, so I'm working backwards through the IAC. If Loftus had hired somebody or if he had, when he, he had objected to Cano because this, this audio tape covered the time when Raul, when Mr. Quiroz supposedly confessed. And so to just let it lie dormant and not even go to the court and say, Your Honor, we have a problem here. The prosecutor told the jury they can't hear or read a transcript of the, of their recording because it's unintelligible. But now you have a police witness who's going to say things and says things bad for us, even though she said, well, I didn't hear him confess. She also said, well, that might've been on another part of the tape I didn't listen to. Was the tape ever, was there ever a motion at some point afterwards? I know there wasn't at the trial level, but a motion to suppress the confession based on coercion? We, we raised that direct, we raised that on direct appeal. The. Which means you raised it in, you also raised it in the trial court. We raised it here, yeah. You raised it in the trial court. Right. You raised it on direct appeal. And then you're raising it again here. So there's the issue of, do you get to do it again here? I, I realize we're taking you, you're using up most of your rebuttal time. I just, you know. I know. We have to add the questions. Yeah. I want to make sure I'm explaining it right because it gets a little. I'm sorry. No, is that what you were wondering? Because, because of the double levels with IAC and, and it gets a little attenuated. But the, the, we're saying that that's one of the, well, he tried to, he tried to create a record on, on the trial, at the trial of coercion by cross-examining Cano. But, but there was no motion to suppress the statement. No, no. And then you move on to the appeal. And was there a hearing on that at the state level? Was there a decision on that? No. The only time, in the appellate level, the only time, because the, the, I think the, there were the two coercions. One was Ruben Gonzalez and the other was, so maybe, maybe it applied to both. But the Court of Appeal, I believe, in direct, on direct appeal, said you don't have a record, sufficient record, to say on the face of this record there was coercion. So then we circled back around with habeas. Because the confession isn't a confession to the officer. It's people talking through the toilet, isn't it? The, no, it was to Cano, who was not an officer. He was, he was an inmate. Well, but he's not an officer. No, he's not.  So it's, and Cano was impeached because he got a, he was trying to work down his own issues. He had felony convictions, correct? Right, right. And he had inconsistencies in his testimony. Right. And the prosecutor, though, said, you know, don't believe Cano by himself. You need corroboration, and we have it. You have it. Now you can convict him, Rachel Burr. And all of that was about the, it all, you know, trial counsel should have brought some kind of emotion. How can it not be ineffective assistance when all these kind of little moments are happening? And because he doesn't know what's on the audio tape, he can't respond. Did you object in the trial court to the admission of that testimony? You did, didn't you? Isn't there some objection in the record? I don't think he did. I think he just tried to impeach him. Tried to impeach him. You know, I have to go back. Did Loftus say that he didn't know he could, in the declaration, that he didn't know he could? That was for Gonzalez. For Gonzalez, okay. Yes, he didn't know, and he said, my bad, you know, kind of. But it was for Gonzalez, not Cano. No, Cano, I think he just tried because it was, the coercion was more, you know. Well, how could you have been successful? How could a lawyer have been successful? And it would be sort of like, okay, let's do the hypothetical. I'm a prosecutor, and I'm going to call some witnesses that are damaging to your client. And you say, Your Honor, I object to letting that person testify. Well, that's not a basis for keeping evidence out. You can cross-examine. You can diminish the evidence. But if there's no legal basis for keeping it out, so what is your legal basis right here and now for keeping that evidence out? Well, so that's exactly makes my point. He couldn't. Well, I don't think I think you've made your point, but maybe help me on that. Yeah, so our basis now is IAC because we're in 2254, so we can't, you know. But at the trial level, what we've argued in this habeas proceeding is he could have, you know, and he could have hired an audio expert. We did, and our audio expert, you know, using technology, he was able to hear stuff. And he was able actually to hear Cannell make inculpatory statements about himself that Rachel Burr had attributed to the two heroes. Okay. Well, you're already two and a half minutes over. Okay. Unless my colleagues have questions right now, I'm going to cut you off here. Okay. I will give you two minutes for rebuttal so we can listen to what your friend on the other side has to say. Thank you. So you'll have an opportunity to respond. All right. Thank you. Good morning. Good morning, Your Honors. Deputy Attorney General Susan Kim for respondent. I want to begin by responding to some of the issues that were raised by Your Honors' questions to current counsel for petitioner. And the first thing I want to do is kind of give the background of the audio recording issue regarding his claim of ineffective assistance of trial counsel, Mr. Loftus. So the declaration – Maybe in part of that you will then address why it was not an effective assistance to not review all of the audio. I will. So I do want to just summarize a little bit of the factual background just for clarity. So Mr. Loftus, in his declaration, which was attached as an exhibit to the state Habeas Courts as well as the federal Habeas Courts, declared in part that he and a translator, a Spanish translator, you know, began to listen to this audio tape that he received from the DA's office, but they – you know, he felt that it was really difficult to understand and unintelligible. So he – his tactical decision was we're not going to be able to really decipher this. So he didn't hire a forensic audio expert, and that's what he declared. Now, current counsel, Mr. Ellis, in his Habeas petitions, he attaches two declarations that are relevant to this issue. The first declaration is by Mr. Kent Gibson, who is a forensic audio expert, and he lists his qualifications. And Mr. Gibson – and, again, these declarations were all before the state courts as well as the federal court on Habeas. Mr. Gibson declares, in relevant part, that he used his audio enhancing equipment, and this is with regard to the CDs that they have, that Defense does have, and for major portions of it he really couldn't make anything of it, even with that equipment. And his declaration also includes that Mr. Ellis, speaking of current counsel, asked Mr. Gibson to look for two statements, whether he could hear two statements on this audio. The first statement was, I – So the audio that this expert was listening to, how does that compare to the audio that was available? It is the same audio. The only difference is that Mr. Gibson, with his background and expertise, used whatever audio enhancing equipment he had to listen to what he thought he could listen to, the parts he could. So is it the same audio that Loftus listened to? That he began to try to listen to, yes. I was – I may be confused, but I was understanding Mr. Ellis to say it wasn't the same audio. It is – no one else has a different audio from what I have reviewed of the record. This is the same audio recording. Is it the same audio that Byrd listened to? She listened to a – I'm not sure if it's the identical same copy, but the substance as far as the length and the approximate number of days, it should be the same audio recording. When you say should be, how do you know that? Because it sounds to me, at least from what I've read, it's possible that Byrd listened to a better version of this audio. So I think the copy she had perhaps might have been a better – I don't know, to be honest. I don't know the exact copying of the audio. But as far as the substance, it appears that it should be the same substance. Well, of course the substance is the same. The question is whether you can understand what's on the tape. And mine was under the impression that Byrd listened to an audio that had better quality. I may be wrong, but that's my impression. I think her testimony at trial said that she did listen to parts that were intelligible, but that a great part of it was not intelligible, and she was unable to listen to it. I actually listened to part of it myself. The part that's pertinent is day one around hour three. When you say you listened to it, you listened to the degraded one? The one that current counsel provided to me. Yeah, right. So it is difficult to understand, I will have to say. But I do want to bring up that Mr. Gibson said that the two statements that Ms. O'Connell testified at trial, he heard petitioners say to him during this jail conversation. The first one was, I think, quote, I smoked that fool. And the second was something to, quote, blasted him maybe four times, like those kind of words. And Mr. Gibson said when he listened to what he could of the audio, he didn't hear those two statements. And it's really important to note that this is exactly what Detective Rachel Burr testified to at trial. And so Loftus had declared in his declaration, I used Rachel Burr's testimony on cross-examination to impeach Cano's more harmful statements, those two statements I just quoted. So even in retrospect, trial counsel Loftus did not perform deficiently because he ended up with the same result that current counsel is trying to get his own forensic expert to say. And the other second declaration that current counsel appears to rely on is, and he referred to it, is of petitioner's other current defense attorney, Mr. Jeffrey Harper, who, one, is not an audio expert. He does not list in his declaration any expertise related to forensic audio recordings. He's an attorney from Florida who is assisting petitioner in his current habeas case now. And he declares in a very lengthy declaration that he listened to all approximately 19 hours of this audio with just an unenhanced version. So he, again, does not have any enhanced equipment like Mr. Gibson apparently would have. And that he then interprets what he believes he hears on this audio. So the things that he says he heard, first of all, given that he's not an expert, that's questionable. And I do want to point to one specific example. One of the questions that Your Honors asked before was, what can current counsel point to in this audio that is supposedly helpful to petitioner's defense to show that he's, you know, to help his case? And I'm not sure because it's not specified in the briefing, but it appears I read all the declarations in the pertinent Harper declaration, attorney Harper, on the excerpts of record page 622. There's a statement that Mr. Harper says petitioner said. And it's, quote, I know it wasn't us. But at the same time, that same statement, I know it wasn't us, Rosario Gonzalez, who was a district attorney investigative assistant, she reviewed the first three and a half hours of this audio tape. And she transcribed portions of it that she, you know, were relevant to this case. And that same statement, I know it wasn't us, she attributed that to Mr. Cano. So even that statement, if petitioner is currently relying on that as some type of exploratory evidence, it's questionable whether who said that. So that is something to note. And just in general, as far as all these claims have been effective with system counsel, as Your Honor did bring up, it's important to note that appellant was at trial. The prosecution had two theories of the murder as a direct liability theory of being the actual shooter of the victim, as well as an aider and abettor. So even apart from the Cano audio tape, all this evidence surrounding this particular area, even apart from that, he cannot show strictly prejudice because there is abundance of other evidence to support his guilt. But what about the theory that if he, the cumulative theory? There seems to be these little things, for example, you know, the prosecutor argued at the trial that Quiroz stated he shot him four times and that's something that wasn't out in the public yet or the newspapers, it wasn't available in the newspapers. But later on, I guess petitioner argues that it was available in newspapers and all Loftus had to do was do a search to find these newspapers and that would have rebutted the prosecution's, you know, reliance on this theory that it wasn't available to the public and that Quiroz only knew things because he must have been there. So that would cover the aiding and abetting and would also cover what assists them in their defense. Just to respond to that newspaper issue, the declaration by Loftus, he specifically addresses the newspapers and says that he made that tactical decision, you know, to you, because Rachel Burr testified at trial on many things. But she did refer to petitioner referring to newspaper articles during that jailhouse conversation and trial counsel Loftus also said at trial in his closing, these newspapers, you know, who knows what they said, but that's not my burden to show. That's the prosecution's burden, so that's clearly a tactical decision he made to say, okay, if he even said something like, well, if so anyone could read the newspaper, then anyone could have committed this. So he didn't specify what was in these newspaper articles, but he argued about them by saying, okay, you know, Detective Burr testified about them and if it's out there, then, you know, it's out there. So it's not something he let go. It wasn't something he decided to ignore, but he was aware that they were out there and he decided to use it to his advantage for his defense at trial. I thought it was the opposite, that the prosecution was arguing that Quiroz had made statements that were not in the newspapers, that were not in the public. And so Loftus could have very easily done some research and brought in those newspapers that now I guess the current counsel has found and said, look, it was out there, that he was shot four times, that he was, you know, whatever other information. And doesn't that just fall below the Strickland standard in and of itself? Well, I think in this case it had over 70-plus exhibits, and I think with the limited resources that trial counsel Loftus had at the time of trial, he made tactical decisions, and many of them were quite reasonable. And perhaps this tactical decision, not to pursue the newspaper article path, was something he thought was less important than other more important tactical decisions like using whatever testimony that Detective Burr would have provided so that he could undermine Cano's more harmful statements about direct, being the direct shooter. So I think looking at the many decisions that were made by trial counsel Loftus, I don't believe that he performed efficiently under the Strickland standard, including the newspaper, including the audio tape, including the many other issues. Obviously when you're convicted, no one's ever happy, you know, and they wouldn't make him the same again. But I think Judge Fletcher was, was he convicted of being the shooter? Well, he was convicted of first-degree murder of the victim. Yes. But it's not specified. And one thing I do want to clarify, based on my review of the record, I believe that as far as the personal firearm enhancement, it was 11 to 1, but I don't believe the record states which way the jury voted, whether it was true or not true. So I don't believe... But he wasn't convicted of that. He wasn't. He was found, it was found not true. But the record indicates the numbers were 11 to 1, but it doesn't say either way. I believe Mr. Ellis is suggesting that it was, that they found him not guilty of having the, you know, like either way, it's not clear from the record. Well, I guess from the standpoint that, that would go to how was he prejudiced. If he wasn't convicted of being the shooter, I mean, he was convicted of first-degree murder, and the prosecution argued two different theories, and we don't know, and I don't think we're required to know which one was the one that carried the day. But had he been convicted of the firearm enhancement, that would have said that the jury said he was the shooter. So would he be able to show more prejudice by not looking at those articles if he had been convicted of being the shooter? I think the articles and the other evidence that Petitioner is currently alleging as a basis for his claims of ineffective assistance, you have to look at... I do want to address the strict and prejudice prong, and I do want to summarize some of the other evidence apart from the ones that he's complaining of. So first of all, Kano isn't the only person that Petitioner told that he shot the victim. Nicky Woods, who was also in jail at the same time as Petitioner at some other date, they were both in a cell where, my understanding is, through toilets, there's vents where you can hear each other. And Nicky Woods and Petitioner knew each other in the same social circles. Many of their friends sold drugs, used drugs. And Petitioner asked her, you know, is Shiloh, I guess another one of their mutual acquaintances, is she mad at me? And Nicky Woods said, why? And then Petitioner replied, because I, quote, blasted Brian. Brian is the victim's first name, Brian Sosek. So there's another time where he admitted to someone else that he shot the victim. And in addition to that, you have to look at the, and I know my time is up, but if I may just quickly sum up. Well, you're not, it's not up. You still have some time. Oh, okay. There's a little warning light. Yeah, I'll give you a little extra, because I already gave him extra. Oh, thank you. So looking at his behavior, Petitioner's behavior, before the shooting and after the shooting, it's important to note that Petitioner borrowed this Pontiac car from Mr. Navarette the night before the shooting. He and Ruben Gonzalez went to the resident, or went to pick up the victim, Brian Sosek. Then they drove around, and I think as Mr. Espinoza joined them at some point in the car. And this is in large part also based on Gonzalez's interview statements. Well, there's some passenger that's in the car when the shooting occurs. And the car has some damage, and the car was cleaned up, right? Yes, but Petitioner was very active. And after the shooting, he brought the car back to Mr. Navarette, said that he would help him repair it. The car at that point had broken glass. Petitioner actually got a vacuum and tried to clean up the glass at another property location. And subsequently, after Petitioner was arrested, he actually called that person. His name was Gary Kleinsmith. Her name was Leanne. His daughter, he called Leanne and said, oh, tell Gary to get rid of that stuff. Wasn't there something, lay low? Yes, he also warned him to lay low with Mr. Navarette. He told Mr. Gonzalez, don't say anything after the shooting. And you have to understand the context of why would Petitioner want to kill Brian Sosek. They were childhood friends. And it all goes back to the fact that Mr. Sosek was an informant, and he worked with law enforcement to have other drug, people who were selling drugs, and have them arrested, one of them being Hector Flores. Does the jury know this? Yes, the jury is aware of this. Does the jury know that Mr. Sosek was an informant? Yes. And that goes to why this all happened. Because if, and also, so there was a conversation, a phone conversation between Petitioner and Hector Flores, who was one of the people who were selling drugs, who was impacted by Sosek's involvement with law enforcement. And Hector Flores told Petitioner, I think your guy, meaning the victim, you know, he's working with the police or is undercover. And they had a conversation to the effect of, are we on? Like, basically, take care of this. And then when Petitioner was back out of, I think, jail or something, he actually called his high school friend, who was also a childhood friend of the victim. His name was Chris Ellis. And he called Chris Ellis and said, hey, where's Brian? You know, have you seen Brian? And Chris Ellis said, oh, I haven't seen him. I don't know what's going on. So he started actively looking for the victim. He got this car, borrowed from this other man, drove the victim around, and most importantly, there's gas station evidence in Santa Barbara, which there were a group of four people. Their names were Christopher Grabiel, Misty Aguilera, and Tonya Velasco, and a third man, Andrew Castor, who actually didn't provide any information. But at this gas station, these four people were in Santa Barbara. Roughly, the shooting happened on August 26, around 4 a.m. in Oxnard. On August 27, excuse me, in the early morning hours. On August 27, like in the very early morning hours, these four at the gas station met Petitioner, Brian Sosek, and two other men, including Gonzales. One of them testified that, first of all, one of them was intoxicated, or they were all intoxicated. And then one of them said, I don't recognize him or withdrew his identification. And then the other three never ID'd Petitioner. So just to clarify, so yes, Christopher Grabiel and Andrew Castor did admit they were drinking that night, and they did admit some level of intoxication. That was presented to the jury for their credibility to be determined. And Andrew Castor did not identify anybody that he's one of the four that did not provide any information. But Christopher Grabiel did later, when he spoke to DA investigator Mr. Coughlin, picked a photo of Petitioner and said, oh, I spoke to this person at the gas station that early morning because he asked me for directions to a casino. And then he specifically, yes, he admitted his intoxication, but he also did make that identification. So there is an identification of Petitioner at that location at that time. The other two women, first Missy Aguilera, she was drinking not as much as the other two men, but she also admitted that she was out because they were out there going to bars and were driving around other parts before that. Miss Aguilera said that she was at the gas station in their car, and she, when shown a picture of the victim, said, oh, this man was in that other car, referring to the car, the Pontiac. So she identified the victim at that gas station location at that time. And as far as identification, I believe her words to the police officer were, it kind of looks like him. So it wasn't, as Your Honor said, like the clearest of identifications. But she didn't say, oh, no, I'm talking about Petitioner, excuse me, not Brian Sosek. But when she was shown a picture of Petitioner, she said, it kind of looks like him. So there was that. And then the other person, Tonya Velasco, and this is very important, Tonya Velasco was not drinking because she was their designated driver of the four people in their own car. She said she was in the car, and she, you know, when one of the men, Mr. Grabiel, came and said, oh, these guys want some directions to the casino, Miss Velasco took her gas station receipt, a piece of paper, wrote the casino directions on it, and then gave it to that group of men. And then, you know, she said, when asked by the police officer and shown all these pictures, Miss Velasco said of Appellant, he looks very familiar. So there's that. But most importantly –  I'm quite a bit over. May I just add one final sentence, please? The gas station receipt was found at the body of the victim in the alley. Okay. So for all these reasons. So I'm assuming that your rather extensive review of the record goes to the evidence that was before the jury and to prejudice. Is that correct? Yes, that is correct, Your Honor. All right. Thank you. Thank you very much, Your Honors. I'm sorry. If either of my colleagues have additional questions. Okay. All right. So with your two minutes I'm giving you now, I've tried to be fair to both of my children here. So I think I've evened it up. We appreciate it. So first of all, you know, when there's a guilty – and I don't have to tell this court that – where there's a guilty plea and you're, after the fact, looking back and picking out little pieces of evidence that would be consistent with that, that's, in my opinion, it's not – When you say where there's a guilty plea, do you mean a guilty verdict? I meant verdict, I'm sorry. Okay. Thanks. Yeah. When you go back and look, they're all going to be – that's the whole thing about evidence not getting in, exculpatory evidence. It's always inconsistent with, after there's been a conviction, with what you have. All those circumstantial things, I mean, the talking through the toilet, once we got into habeas, the AG kind of abandoned that witness because she was not very incredible. So, you know, yes, they can go through and pick these things consistent with the verdict, but that doesn't mean that if we got relief on habeas, there wouldn't be prejudice. Because – and this is the last thing I want to say – prosecution, Cano is our main witness. That's what he said. Unique corroboration, Rachel Burr. So if you take – and the reason he's their main witness is because he's going to say Raul – that Quiroz confessed. Rachel Burr is going to loft his hopes that he would be able to undermine Cano by her testimony. He wasn't able to. So now we have their primary witness, and we have their corroborative witness, and we have an attorney who has no idea what's on that tape. And you're right that the – what Rachel Burr was listening to is not clear, but it's suggested – to me it seemed like she was given something by her husband. And there was ancillary statements on habeas that different people had their own record as well. This was going on. So how can that – we're saying how can it not be when you have a recording that this witness is testifying about, how can the jury not be given that, and how can there not be a transcript? There's something wrong. And just because there was this other evidence about after the fact, that doesn't undermine that. It's just below the standard for him not to have brought it up to the court, brought a motion to keep it out, or obtained – done something. Maybe back then there would have been – nobody ever saw on the defense the actual master recording. And Ken Gibson said the one we have was a copy, may have been a copy of a copy, he said. So – and the other issues we've raised, we're still adhering. You know, we're submitting them on the briefing. Right. We're not – we're not ignoring any of those. Thank you very much. Thank you both for your arguments in this matter. It will stand submitted.
judges: FLETCHER, CALLAHAN, Marquez